IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JESSE ROMERO, on behalf of himself and
all others similarly situated,

      Plaintiffs,

v.                                   Case No. 1:17-CV-00775-KG-SCY

TITLEMAX OF NEW MEXICO, INC.,
TMX FINANCE, LLC, and TRACY YOUNG,

      Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT

> *Loan-shark: a person who lends money at excessive rates of interest; usurer.*[1]

> *The etymology of the term "loan shark" is not difficult to understand. The piscivorous scavenger of the deep has its counterpart in the scavenger money-lender who preys upon indigent borrowers and exacts unlawful and unconscionable profits from that class of people who, as a result of limited financial resources are frequently in need of small loan credit.*[2]

TitleMax of New Mexico, Inc., TMX Finance, LLC, and Tracy Young, by both their business practices and by the terms of their agreements with their customers, have violated the New Mexico Unfair Practices Act, NMSA 1978, §§ 57-12-1 through -26.  Plaintiffs—the customers harmed by those violations—bring this First Amended Class Action Complaint to remedy Defendants' violations of New Mexico law.[3]

## PARTIES

1.      Plaintiff Jesse Romero, individually and as class representative, is a resident

---

[1] The Random House College Dictionary 785 (rev. ed. 1980).

[2] Stewart Lynch, *Prosecuting Loan Sharks Under the Mail Fraud Statute*, 14 Fordham L. Rev. 150, 150 (1945).

[3] Plaintiffs file this First Amended Class Action Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B).

of Bernalillo County, New Mexico.

2.      Defendant TitleMax of New Mexico, Inc. is a Delaware corporation with its principal place of business in Georgia. However, it operates only in New Mexico, and it does so through fourteen separate storefronts located throughout the State. It conducts business in New Mexico by, among other things, making small loans to New Mexico consumers that carry triple-digit interest rates and are over-secured by the title to each customer's vehicle. As discussed in more detail below, TitleMax of New Mexico, Inc. is the mere regional instrumentality of Georgia-based defendants Tracy Young and TMX Finance, LLC. It is their alter ego and agent (actual and ostensible).

3.      Defendant TMX Finance, LLC ("TMX") is the "parent" company of TitleMax of New Mexico, Inc. It is a Delaware limited liability company with its principal place of business in Georgia. It operates in New Mexico, under the complete control of its sole beneficial owner, CEO, and chairman Tracy Young, through its alter ego and regional agent (actual and ostensible) TitleMax of New Mexico, Inc.

4.      Defendant Tracy Young ("Young") is an individual and a resident of Georgia. He is the founder, sole owner, chief executive officer and chairman of the board of TMX. He is also the sole beneficial owner, chief executive officer and director of TitleMax of New Mexico, Inc., which is wholly owned by TMX. Young actively creates and implements the unfair and deceptive business practices of the entity defendants, controls said defendants, manages their course, and dictates the goals to be achieved. When TitleMax of New Mexico, Inc. and TMX act unfairly and unconscionably in New Mexico, they do so under the complete domination and control of Young, and their actions are intended to benefit Young,

the dominant party and sole owner. Indeed, he formed TMX and its regional instrumentality TitleMax of New Mexico, Inc. as conduits through which he could implement his unfair and deceptive title loan business practices in New Mexico. TitleMax of New Mexico, Inc. and TMX are his alter egos and agents (actual and ostensible) for New Mexico. Accordingly, he is personally liable for the harm caused by the unfair and deceptive business practices of the entity defendants—practices that he was instrumental in designing and implementing.

## JURISDICTION AND VENUE

5.      Subject matter jurisdiction over this matter arises pursuant to 28 U.S.C. § 1332(d).

6.      In paragraph 7 of its Answer [Doc. 8] TitleMax of New Mexico, Inc. admits to being subject to personal jurisdiction in this matter.

7.      Personal jurisdiction over Defendant TMX Finance, LLC arises because it has purposefully availed itself of this forum through its direct business activities in New Mexico and directed at New Mexico citizens. These activities include but are not limited to recruiting and hiring New Mexico citizens for employment through advertisements directed specifically at New Mexico citizens which direct them to locations in New Mexico where they may appear and be interviewed/hired by TMX Finance, LLC. It has also purposefully availed itself of this forum through the business activities in New Mexico of its alter ego and regional agent TitleMax of Mexico, Inc.

8.      Personal jurisdiction over Defendant Tracy Young arises because he has purposefully availed himself of this forum through the business activities in New Mexico of his alter egos and agents TMX Finance, LLC and TitleMax of New Mexico, Inc. He uses these

two defendant companies as instrumentalities to further his deceptive and unfair business practices and profit therefrom. He should not be permitted to use as a jurisdictional shield the very instruments he created to introduce and subsequently saturate the New Mexico market with his unconscionable practices.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because New Mexico is where a substantial part of the events giving rise to this class action occurred.

## BACKGROUND

***A.      Relationship Between Tracy Young, TMX Finance, LLC, and TitleMax of New Mexico, Inc.***

10.      In 2003, Tracy Young formed TMX. During the time relevant to this action, TMX has described itself in public filings as a privately-owned automobile title lending company that conducts operations through its wholly-owned subsidiaries.[4] This pass-through relationship renders subsidiary TitleMax of New Mexico, Inc. a mere regional agent of TMX. This relationship is further evidenced by a Consumer Finance Protection Bureau *Consent Order* entered on September 26, 2016 against TMX for the unfair and abusive lending practices at the subsidiary level. Importantly, the CFPB imposed the $9 million fine on TMX. It did not fine the subsidiaries. In imposing the fine on TMX, the CFPB had to determine that the actions of the subsidiaries were directed and controlled by TMX such that the actions were the acts of TMX itself or done at its direction.

11.      In addition, when advertising for employees in Albuquerque during the time period relevant to this action, it was TMX, <u>not</u> TitleMax of New Mexico, Inc. that solicited

---

[4] TMX ceased submitting filings with the Securities and Exchange Commission around March of 2013, shortly after it expanded into New Mexico.

the employees to work in the TitleMax of New Mexico, Inc. stores in New Mexico. In these on-line advertisements directed specifically at New Mexico citizens, TMX stated that *it* was conducting the hiring for "our newest TitleMax New Mexico locations," and "TMX Finance hires outgoing individuals with charismatic personalities." The advertisement went on to tell New Mexico citizens that "TMX Finance has plans to continue expanding our footprint throughout 2014, including an additional six TitleMax locations in Albuquerque, NM."

12.     As the alter ego, TitleMax of New Mexico, Inc. also is required by TMX and Young to unconditionally guarantee TMX's third-party obligations, which include a revolving credit facility and numerous secured notes. And in TMX's public filings, it notes that it does not separate the finances of subsidiaries like TitleMax of New Mexico, Inc. from its own because these subsidiaries are fully liable, jointly and severally, for TMX's debts. Rather, it lumps itself together with all of its subsidiaries because, per TMX, a combined financial statement provides more accurate information. Said differently, TitleMax of New Mexico, Inc. is obligated on TMX's debts as if they were one company, and TMX claims TitleMax of New Mexico, Inc.'s revenues as its own as if they were the same company.

13.     From inception, Young has been the sole owner and controller of the TitleMax machine, which presently encompasses over 1,100 stores in sixteen states. Young owns 100% of TMX Finance Holdings, Inc., which in turn owns 100% of TMX, which in turn owns 100% of the TitleMax stores in America, including all fourteen in New Mexico listed under the name TitleMax of New Mexico, Inc.

14.     TMX publically acknowledges that Young controls all matters of significance for TMX and its wholly-owned subsidiaries which, again, includes TitleMax of New Mexico,

Inc. Per TMX, these matters of significance include control over the strategy and direction of the businesses. As discussed in further detail below, the strategy and direction focus principally on charging exorbitant interest rates on over-secured loans to consumers who are in no position to negotiate or reject the terms, and then keep those consumers in a loan for as long as possible so as to maximize the profit from the unconscionable rates.

15.     Upon information and belief, TMX's operating agreement significantly limits the authority, role, and responsibilities of all managers other than Young, and subjects these managers to the direct authority of Young in all material respects. As an example of this control, all executive officers serve at the pleasure of only Young, and not the other managers. In effect, the other managers are mere figureheads, and Young holds absolute control, both as the chairman and as the profiteer, to use TMX and TitleMax of New Mexico, Inc. to implement his deceptive and unfair loan practices.

16.     Young's abuse of and disregard for the corporate form is further evidenced by his free use of TMX company assets for personal pleasure. In 2012 alone, TMX reported $298,057 in unreimbursed operating costs as a direct result of Young's personal use of company aircraft.

**B.      *TMX and Young Move Into the New Mexico Market***

17.     By 2012, Young had positioned TMX as a high-interest loan behemoth with over 1,000 of its stores nationwide and an unabashed appetite for expansion. New Mexico was singled out as an expansion target due to the State's significant unbanked/underbanked population and the absence of specific, statutory regulation of title loans. In plain English, New Mexico was identified as having a sizable population of the

financially desperate whose situation could be exploited, and TitleMax could do so without the burden of state-level regulations. Consequently, in March of 2013 Young used TMX to expand into New Mexico by forming the wholly-owned subsidiary TitleMax of New Mexico, Inc.

18.     In four years, TitleMax of New Mexico, Inc. has ballooned to include fourteen storefronts throughout the State, making TMX, through its alter ego, one of the largest title lenders in New Mexico. Since moving into the State, Defendants have issued 32,481 title loans in New Mexico, to 12,120 different individuals, for an aggregate principle amount of $43,460,715. If every one of these loans reflected terms similar to Plaintiff Jesse Romero's loans, which is expected, and everyone paid only what was charged without rolling the loan over, then Defendants should have made $126,036,080 *in interest revenue alone* during the four years that it has been operating in New Mexico.

**C.     *Young, TMX, and TitleMax of New Mexico, Inc.'s Predatory Lending Structure***

19.     Defendants' title loans—dreamed up by Young, implemented through his alter ego TMX, and executed at the New Mexico consumer level through TitleMax of New Mexico, Inc.—are offered for a relatively small amount of money, with exorbitant interest rates, and secured by the title to the borrower's vehicle. In the event the borrower is unable to pay off the loan, TitleMax of New Mexico, Inc. repossesses the vehicle pursuant to policies and procedures drafted and enforced by TMX.

20.     The loans are offered on a take-it-or-leave-it basis giving the borrower no opportunity to negotiate the terms of the loan.

21.     Defendants (and other small lenders) market their products to the financially

imperiled. Touting their loans as financial alternatives for people who lack access to traditional credit, Defendants prey on the financially desperate. From 2004 to 2008, the average gross annual income of all title loan borrowers in New Mexico was between $20,116.00 and $27,719.36.[5]

22.     Despite the fact that their clientele consists almost exclusively of the poor, Defendant TMX, through its agent and alter ego TitleMax of New Mexico, Inc. issue the loans based only upon the customer's need and wholesale value of the vehicle offered as collateral. Neither TMX nor its agent perform any meaningful underwriting on its title loans and thus make no meaningful inquiry into the ability of a borrower to repay the loan. Instead, TMX protects itself in the event of default by lending a small amount of the resale value of the borrower's vehicle (40% or less) and repossessing the vehicle in the event of default.

23.     Indeed, the loans are often structured to ensure default—and thus repossession of the borrower's vehicle—but not before the borrower has made one or more payments on the loan. Defendants advertise their lack of underwriting as a benefit to their borrowers, proclaiming that "any credit type is welcome," they can quickly approve applications as long as the borrower has "a car that's paid off along with its title," and emphasizing that "it only takes about 30 minutes for us to put money in your pocket."[6]

24.     Title loans carry much higher interest rates than loans offered from more traditional lenders, such as banks. Where a traditional personal loan from a bank or credit

---

5 Nathalie Martin and Ozymandias Adams, *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 Mo. L. Rev. 41, 77 (2012).
6 *See generally* https://www.titlemax.com/title-loans/ (last visited June 15, 2017).

union typically carries an interest rate between 6% and 33%, a title loan typically carries an interest rate between 140% and 600%.

25.     The terms of a typical title loan are onerous. Payments are due every two to four weeks and the loans generally carry a term of approximately thirty days.  Loans that are not paid within the initial time period are often rolled over, and the borrower makes payments until the balance is paid or until his or her vehicle is repossessed.  Like most loans, title loans are amortized in such a way that early payments made by the borrower go to the interest on the loan.  Unlike most loans, however, if a borrower pays back a title loan on the typical terms of such a loan, the borrower can pay several times the amount borrowed.

26.     Many predatory lenders contend that the annual interest rates attached to their products are misleading because the loans are amortized over short period of time, typically two weeks to a month.  That argument is unpersuasive, however, in light of the number of times those loans are rolled over or otherwise extended.

27.     But even this unpersuasive argument is unavailable to Young, TMX and TitleMax of New Mexico, Inc., who offer loans at triple-digit interest rates that are amortized not over two weeks, but two *years*.  Indeed, Defendants expressly try to convince their borrowers that some short term loans are dangerous.[7] It is also worth contrasting Defendants' title loan structure, which purposely facilitates the accrual of interest payments due to lengthy amortization periods, with how the New Mexico Regulation and Licensing Department-Financial Institutions Division expects a title loan to behave.  The Regulation

---

7 *See* https://www.titlemax.com/faqs/how-to-make-money/ ("It's also a good idea to avoid loans that are so short-term, that severe consequences could result.") (last visited June 15, 2017).

and Licensing Department describes a title loan as "a loan secured by the borrower's vehicle title, which is structured to be a _short term_, _fixed rate, closed end transaction usually paid in one installment._"[8]

28. Mr. Romero's situation is typical. Defendants charged him an annual interest rate of approximately 145%, which was amortized over twenty-four monthly payments. Pursuant to his last contract with Defendants, that extension of credit would cost him $4,056.09 in interest alone—on a $1,940.44 loan. Few people, let alone the financially disadvantaged population to whom these loans are marketed, could ever repay rates of this magnitude.

29. In the face of these numbers, Defendants still declare on their website that their interest rates are not high: "While some lenders do charge high interest rates, TitleMax charges very competitive interest rates."[9] Defendants do not, however, explain with what other loans their rates are "competitive."

30. Many borrowers have difficulty repaying loans offered on such onerous terms. Indeed, the title loan system in general, and Defendants' contracts specifically, are designed to impede successful repayment. They are marketed to those who have little to no ability to repay, they include interest rates that are unconscionable, and they are available for roll-over which only increases the interest owed and puts the borrower deeper in debt.

31. Due to the oppressive interest rates, many borrowers and class members are often left with no choice but to roll over the loan, and TMX through its agent/alter ego

---

[8] New Mexico Reg. & Lic. Dep't, Fin. Institutions Div., 2015 New Mexico Installment Loan Product Annual Report 2 (2016) (emphasis added).
[9] _See_ https://www.titlemax.com/faqs (last visited June 15, 2017).

permits borrowers to roll over their loans as many times as the borrower requests to do so. As a general matter, after a borrower has rolled a loan over several times, he or she has usually paid an amount of interest equal to the amount he or she borrowed without having touched the principal of the loan at all.

32.     Again, Mr. Romero's situation is representative of this common scenario. He was allowed to roll over the original loan and add additional principal to the new loan. He dutifully paid the monthly payments for six months, which amounted to roughly $1,644.52 in total payments (on a $2,075.00 loan). After making these payments, however, Mr. Romero learned that only $72.43 had been applied to the principal balance, and therefore he still owed virtually all of the principal.

33.     Because he could not continue in this manner, several months later he approached TitleMax of New Mexico, Inc. for guidance. The company, simply adhering to TMX's policies and procedures, offered to, and did, roll the loan over for him yet again, which reset the payment period out another twenty-four months. To date, he has paid roughly $2,400 on a $2,000 loan, yet his current loan documents from Defendants reflect that he still has $5,996.53 left to pay on that loan. Mr. Romero's situation is typical in New Mexico.

34.     Apart from the interest rate trap, title loans are also deeply over-secured, meaning that the value of the collateral used as security for the loan is far greater than the amount of money loaned to the borrower.  This is by design. TMX purposefully charges an exorbitant interest rate that all but guarantees default, and then insulates itself from that risk of default—a risk it has largely created—by demanding significant collateral.

35.     Defendants offer a loan based on the wholesale value of a vehicle or an amount equal to only a percentage of the car's retail value.  Either way, TitleMax of New Mexico, Inc. holds title, for the benefit and at the direction of TMX and Young, to an asset worth considerably more than the amount of the loan.

36.     Moreover, Defendants generally do not accurately inform potential borrowers of the cost of the loan offered. For example, on their website Defendants emphasize the ease of credit and suggest that their loans could be useful to tide a borrower over until his or her next pay day, implying that the cost of the loan should be viewed on a short-term basis.[10]

37.     Nowhere do Defendants describe the cost of credit in the event the borrower rolls the loan over one or more times or attempts to refinance the loan after making one or more payments on it. Nor do they disclose in their advertisements that their title loans typically have lengthy repayment terms, which greatly increases the interest amount owed by the borrower.

38.     Given the interest rates charged to borrowers, the number of times a typical loan is rolled over or refinanced, the fees charged by title lenders like Defendants, and the value derived from repossessing and selling a borrower's car, the title loan industry is immensely profitable. Based on data collected from 2004 to 2008, one scholar has estimated total gross profits to all title lenders operating in New Mexico for those years. Assuming that each loan was repaid without defaulting or rolling over, the industry grossed

---

10 *See, e.g.*, https://www.titlemax.com/faqs/ (where, in response to the question "Why acquire funds from a title lender?" Defendants offer the answer that "[g]etting a title loan is a lot easier than borrowing money from other sources. . . .  You may have enough money to get by, but need some extra funds for something special.  Or maybe you had a rough month and need some cash now to hold you over until your next pay day.") (last visited June 15, 2017).

over $647 million in 2004, over $437 million in 2005, more than $353 million in 2006, over $340 million in 2007, and more than $490 million in 2008.  But because the data showed multiple defaults and rollovers, the actual gross revenue in each year is much higher: nearly $2.2 billion in 2004, over $1.7 billion in 2005, more than $1.2 billion in 2006, over $1.1 billion in 2007, and more than $1.3 billion in 2007.[11]

39.     Even the loans that title lenders charge off are not necessarily losses to the lenders.  A charged off loan is not one on which the lender has ceased collection efforts.  It is, instead, simply a loan that was written off the books as a loss at the end of the year. Accordingly, the loans a lender charges off will include both past due loans in collection and loans on which collection efforts have, at the time, stalled.  But title lenders may attempt to collect past due accounts for up to six years, and those accounts may also be sold to debt collectors.

40.     Indeed, from 2004 to 2008, title lenders reported having collected hundreds of thousands of dollars on past due accounts that had been charged off in previous years: $482,451.19 in 2004, $670,783.10 in 2005, $382,217.53 in 2006, $931,490.23 in 2007, and $640,673.45 in 2008.[12]  Because these accounts had been charged off in previous years, the lenders were able to use them as tax losses, even though interest continued to accrue.

41.     In addition to undertaking collection efforts, Defendants may and do repossess the vehicle pledged as collateral by the borrower.  Taking into consideration the number of repeat customers title lenders like Defendants have in New Mexico, the

---

11 *See* Martin and Adams, *supra* note 3, at 69.
12 *Id.* at 76.

repossession rate—calculated as the percentage of customers who ultimately have their vehicle repossessed by the lender—is remarkably high, peaking at 71.24% in 2008.[13]  Even taking into account the number of borrowers who are able to reclaim their vehicle, the vehicle loss rate for title loan borrowers remains high, peaking at 60.06% in 2008.[14]

42.    Thus many (if not most) of those who borrow from title lenders like Defendants lose their most valuable financial asset in the bargain.  In addition to being their most valuable financial asset, the borrower's vehicle is nearly indispensable in their day-to-day lives.

43.    When Defendants take permanent possession of a borrower's vehicle—when Defendants repossess the vehicle and the borrower is unable to reclaim it—Defendants typically sell that vehicle.  By law Defendants are required to return to the borrower any overage, or any amount recovered in the sale in excess of the amount owed on the loan. The average amount returned under these circumstances to borrowers by title lenders from 2004 to 2008 ranged from a low of $12.06 in 2008 to a high of $67.41 in 2004.[15]

44.    These numbers indicate that title lenders like Defendants routinely fail to comply with commercial law concerning such sales.  Article 9 of the Uniform Commercial Code requires a lender who has repossessed collateral from a borrower to both give notice to the borrower of the sale of that collateral and also to sell the collateral in a commercially reasonable way.  Should the sale generate more money than the borrower owes (including the costs associated with the sale), the lender is obligated to return that surplus to the

---

13 *Id.* at 80.
14 *Id.* at 81.
15 *Id.* at 82.

borrower.

45.    Despite typically lending only 20% to 55% of a vehicle's value, title lenders have self reported in New Mexico that they only return between $12 and $68 in surplus per loan to their customers.[16]

46.    Because Defendants perform minimal underwriting and instead lend money based primarily on the value of the borrower's collateral, Defendants are making loans substantially more likely to default than other kinds of loans.[17]  This result is not surprising, as Defendants' loans are intentionally targeted at an unbanked or under-banked population with low income and below average financial sophistication.

## CLASS ALLEGATIONS

47.    Plaintiff Jesse Romero brings this action on behalf of all similarly-situated consumers.

48.    Plaintiff seeks to certify a class consisting of all New Mexico citizens who have taken out a loan from Defendants since March 11, 2013.  Because Defendants' unlawful lending practices are ongoing, there is no closing date for the proposed class.

49.    Plaintiff is a proper class representative based on the facts set forth in this Complaint, which illustrate Defendants' unlawful business activity.  Plaintiff possesses the same interests and suffered the same type of injury as typical of all members of the Plaintiff Class, and Plaintiff's claims arise from a common nucleus of unlawful conduct giving rise to the claims of the Plaintiff Class.

50.    The members of the Plaintiff Class were subjected to the same unlawful

---

16 *Id.* at 87.
17 *Id*.

conduct by reason of Defendants' common business practices and course of conduct.

51.    Plaintiff does not yet know the precise size of the class but upon information and belief alleges that the class is so numerous that joinder of all members would be impractical. The identity of the individual members of the Plaintiff Class, as well as the amount of their damages, can be determined on a ministerial basis by reference to Defendants' records.

52.    The operative questions of law and fact are common to all class members.

**FIRST CAUSE OF ACTION:
TITLEMAX OF NEW MEXICO, INC., TMX, AND YOUNG'S
VIOLATION OF NMSA 1978, § 57-12-3**

53.    Plaintiff incorporates Paragraphs 1-52 above.

54.    NMSA 1978, § 57-12-2(E)(1) defines an "unconscionable trade practice" to be "an act or practice in connection with . . . the extension of credit . . . that to a person's detriment takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree."

55.    NMSA 1978, § 57-12-3 declares that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

56.    By placing his predatory loan products into the stream of commerce in New Mexico via his alter ego TMX and its alter ego and agent TitleMax of New Mexico, Inc. Defendant Young along with the entity defendants engage in a pattern of conduct that takes advantage of their customers' lack of knowledge, ability, experience or capacity to a grossly unfair degree.  Defendants materially misrepresent to their customers the ease of paying off the loans, the risk of default, and the likely cost of the credit.

57.     Defendants target their loan products to the poor.  Indeed, Defendants justify their loans by contending that they are a valuable offering to people who lack access to traditional forms of credit – *i.e.,* the poor.  In other words, Defendants target their business practices to those least able to survive them.

58.     Defendants also target their business practices to those less likely to truly understand the cost of the credit they obtain.  Defendants' borrowers are typically less educated and less experienced with financial transactions than the mean population.

59.     The terms of Defendants' loans are offered to their customers on a take-it-or-leave-it basis. Defendants' customers have no meaningful opportunity or ability to negotiate any of the terms of the loan, including the interest rate charged, the maturity date of the loan, or the circumstances under which Defendants may repossess their customers' vehicles.

60.     Defendants perform virtually no underwriting on any of the loans in their portfolio.  Defendants instead loan based almost exclusively on the value of the collateral offered by the borrower.  This lack of underwriting substantially increases the risk of default.  Indeed, the interest rate charged by Defendants depends not on any underwriting establishing the ability of the borrower to repay the loan, but instead on the quality of the vehicle the borrower uses as collateral.

61.     Defendants make concerted efforts to keep their customers on the books, actively soliciting loans and taking every opportunity to up-sell their customers into larger loans. Upon information and belief, these unfair goals are created by Young, implemented through his alter ego TMX, and executed upon the consumer by the regional agent and alter

ego TitleMax of New Mexico, Inc.

62.     Defendants' customers are rarely able to repay their loans early or even on the maturity date.  As a result, a remarkably high percentage of Defendants' customers roll their loans over.  Defendants know when they make a loan that rollover is highly likely. Indeed, Defendants' system, as designed by Young, implemented by TMX individually and through its agent and alter ego TitleMax of New Mexico, Inc., is designed to obtain this result.

63.     This conduct results in an extension of credit that takes advantage to a grossly unfair degree of a borrower's lack of knowledge, ability, experience, or capacity. Defendants have willfully engaged in this conduct.

### SECOND CAUSE OF ACTION:
### TITLEMAX OF NEW MEXICO, INC., TMX, AND YOUNG'S
### SECOND VIOLATION OF NMSA 1978, § 57-12-3

64.     Plaintiff incorporates Paragraphs 1-63 above.

65.     In addition to making it unlawful to take advantage of a customer's lack of knowledge, ability, experience, or capacity to an unfair degree, the Unfair Practices Act further prohibits an extension of credit that "results in a gross disparity between the value received by a person and the price paid."  NMSA 1978, § 57-12-2(E)(2).

66.     Defendants' loans result in a gross disparity between the value received by their customers and the price those customers pay.  This disparity is by design, and upon information and belief, is a top-down policy that is conceived by Young, implemented through TMX, and applied to the consumer through regional agents and alter egos like TitleMax of New Mexico, Inc.

67.     The value received by the customers is the amount of the loan.  A customer who borrows $500.00 has received value of $500.00.   The price paid is, of course, the amount the borrower repays on the loan.

68.     Defendants' loans are deeply over-secured. By lending only a fraction of the value of a vehicle, Defendants guarantee that they will have access to an asset that far exceeds in value the amount of money loaned to the borrower.

69.     Despite holding title to collateral far more valuable than the face value of the loan, Defendants charge exorbitant interests rates.  While these loans are offered at lower interest rates than some other small, high cost loan products (such as payday loans), Defendants still charge more than ten times the interest rate charged by traditional lending institutions, routinely amortize their loans over an extended period of time, and do so despite holding security often more than twice as valuable as the amount of money loaned to the borrower.

70.     Upon information and belief, policies regarding how to value collateral, collateral to loan ratios, interest rates, and amortization terms are all designed and implemented by Young and TMX. TitleMax of New Mexico, Inc. has marginal influence on these factors that largely make Defendants' products unfair and deceptive. TitleMax of New Mexico, Inc. merely acts as the regional instrument or conduit used to reach the citizens of New Mexico with these unfair and deceptive practices.

71.     The large number of rollovers means that borrowers routinely repay as much as three or four times the amount of principal.  This is particularly true because of the way Defendants amortize their loans to ensure that the majority of payments made by the

borrower are applied to the unconscionable interest rate Defendants charge and thus do not meaningfully reduce the principal of the loan.

72.     Through this conduct Defendants make extensions of credit that result in a gross disparity between the price paid by the borrower for that credit and the value received by the borrower from that credit.   Defendants have willfully engaged in this conduct.

**THIRD CAUSE OF ACTION:**
**TITLEMAX OF NEW MEXICO, INC., TMX, AND YOUNG'S**
**THIRD VIOLATION OF NMSA 1978, § 57-12-3**

73.     Plaintiff incorporates Paragraph 1-72 above.

74.     In those instances in which Defendants repossess a borrower's vehicle and then sell the vehicle to satisfy the loan, Defendants purposefully engage in conduct designed to ensure that the sale leaves virtually no surplus to return to the borrower.

75.     Upon information and belief, despite this conduct occurring by agents at the store level, the policies that result in this violation are all designed and implemented by Young and TMX. TitleMax of New Mexico, Inc. has marginal influence on the policies it abides by during its sale of repossessed collateral. TitleMax of New Mexico, Inc. merely acts as the regional instrument or conduit used to reach the citizens of New Mexico with these unfair and deceptive practices.

76.     Despite loaning only a small percentage of the value of a borrower's collateral, when Defendants repossess and sell a borrower's vehicle Defendants retain most or all of the sale proceeds.   Upon information and belief, Defendants are either selling the vehicles for less than their fair market value or are timing the sales of those vehicles to

ensure that the accruing interest on the loan eclipses the value of the vehicle.

77.     Either way, Defendants' practices in the sale of repossessed vehicles is a practice in the collection of a debt that results in a gross disparity between the price paid by the borrower (here, the borrower's vehicle) and the value received by that borrower. Defendants have willfully engaged in this conduct.

### FOURTH CAUSE OF ACTION:
### TITLEMAX OF NEW MEXICO, INC., TMX, AND YOUNG'S
### COMMON LAW PROCEDURAL UNCONSIONABILITY

78.     Plaintiff incorporates Paragraphs 1-77 above.

79.     Defendants' business practices described above are procedurally unconscionable. Defendants conduct their business by way of contracts of adhesion, conduct no underwriting of any kind, and engage in business practices intentionally designed to trap their customers—who are financially desperate—in a cycle of debt from which they cannot escape but that are highly profitable to Defendants.

80.     Defendants have willfully engaged in this conduct.

### FIFTH CAUSE OF ACTION:
### TITLEMAX OF NEW MEXICO, INC., TMX, AND YOUNG'S
### COMMON LAW SUBSTANTIVE UNCONSIONABILITY

81.     Plaintiff incorporates Paragraphs 1-80 above.

82.     Defendants' business practices described above are substantively unconscionable. Given the fact that Defendants' loans are oversecuritized, there is no justification—legal or otherwise—for the high interest rates Defendants charge. Defendants' amortization of their loans in combination with the number of rollovers in which Defendants know or should know a typical borrower will engage guarantee that

Defendants' borrowers receive very little value.

83.     Defendants repossession and resale practices are also substantively unconscionable because they deprive their borrowers of any fair portion of the value of the borrowers' vehicle.

84.     Defendants have willfully engaged in this conduct.

**REQUESTED RELIEF**

85.     Based on the foregoing, Plaintiff respectfully requests the following:

        a.     rescission of each loan agreement between members of the Plaintiff Class and Defendants;

        b.     restitution to the members of the Plaintiff's Class representing the difference between the amount repaid by those members to Defendants and the amount that, by law, those members should have paid to Defendants;[18]

        c.     restitution to the members of the Plaintiff Class representing the fees and penalties Defendants collected that were associated with missed, late, or partial payments;

        d.     treble damages pursuant to NMSA 1978, § 57-12-10(B);

        e.     permanent injunction relief against Defendants pursuant to NMSA 1978, § 57-12-10(A) prohibiting Defendants from offering loan products on the same or substantially similar terms as the loan products Defendants currently offer;

        f.     prejudgment and post-judgment interest as permitted by law;

---

18 In the absence of a consciable interest rate, the New Mexico Supreme Court has held that a default rate of 15% should be applied to loans such as those made the subject of this action.  *See State* ex rel *King v. B&B Investment Group*, 2014-NMSC-024, ¶¶ 42, 50.

g.      costs and reasonable attorneys' fees; and

h.      any further relief to which members of the Plaintiff Class may be reasonably and justly entitled.

Respectfully submitted,

Scott Fuqua
FUQUA LAW & POLICY, P.C.
P.O. Box 32015
Santa Fe, NM 87594
(505)982-0961 – Telephone
scott@fuqualawpolicy.com

and

McGEHEE ✯ CHANG, BARNES, LANDGRAF

/s/ Benjamin T. Landgraf
Jack E. McGehee
jmcgehee@lawtx.com
H. C. Chang
hcchang@lawtx.com
Stephen A. Barnes
sbarnes@lawtx.com
Benjamin T. Landgraf
blandgraf@lawtx.com
10370 Richmond Ave., Suite 1300
Houston, Texas 77042
(713) 864-4000
(713) 868-9393 fax
*Attorneys for Plaintiffs and Plaintiff Class*

**CERTIFICATE OF SERVICE**

I hereby certify that I served a true and correct copy of the foregoing on counsel of record via filing with the CM/ECF system on August 25, 2017.

/s/ Benjamin T. Landgraf
Benjamin T. Landgraf