IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JESSE ROMERO, on behalf of himself and
all others similarly-situated,

      Plaintiffs,

v.                                       Case No. 1:17-cv-00775-KG-SCY

TITLEMAX OF NEW MEXICO, INC.,
TMX FINANCE, LLC, TRACY YOUNG, and
JUAN TREVIZO,

      Defendants.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

In an effort to avoid the efficient administration of what Defendants themselves have identified as tens of thousands of similar claims – and in direct contradiction to the arbitration provision Defendants drafted and use in all of their loan contracts – Defendant TitleMax of New Mexico, Inc. ("TitleMax") seeks to compel arbitration of Plaintiffs' claims in the face of a valid opt out exercised by Mr. Romero. While TitleMax would have the Court find that the opt out provision is actually conveys no real rights on their borrowers, the truth is that there is no arbitration to compel in this matter because there is no longer an arbitration provision to enforce. The Court should deny TitleMax's motion.

### BACKGROUND

Mr. Romero began his relationship with Defendants on July 19, 2016. The contract he signed with Defendants, which is attached to TitleMax's motion as Exhibit B, extended a loan of $1,005.00 at an annual interest rate of 156.4484%. It obligated Mr. Romero to make twenty four monthly payments of $138.33, for a total principal and interest repayment of

$3,319.92.  Of that total, $2,314.92 was interest.  Under the terms of this loan, Mr. Romero would pay $230.34 for every $100.00 he borrowed.

Before his first payment under that loan was due, Mr. Romero took out a second loan from Defendants for $2,074.26.  A copy of that loan contract is included in Exhibit B to TitleMax's motion.  Of that amount, $1,004.26 was applied to pay off his previous loan and Defendants gave Mr. Romero $1,070.00 in cash.  This second loan carried an interest rate of 144.0365% and required twenty three monthly payments of $266.52 and a final monthly payment of $266.75.  Mr. Romero was obligated under the loan to pay a total of $6,396.71, of which $4,322.45 was interest.  Mr. Romero would thus pay $308.39 for every $100.00 he borrowed.

After having substantially paid down that balance, Mr. Romero took out a third loan from Defendants on May 15, 2017, a copy of which is attached to TitleMax's motion as Exhibit A.  The loan was for $1,940.44 and carried a 144.4116% interest rate.  It obligated Mr. Romero to pay back a grand total of $5,996.53 through twenty three monthly payments of $249.86 and a final monthly payment of $249.75.  Of the $5,996.53 Mr. Romero would be required to repay, $4,056.09 was interest, meaning that Mr. Romero would pay $309.03 for every $100.00 he had borrowed.

On May 22, 2017, Mr. Romero submitted through counsel written notice to Defendants that he was exercising his right to opt out of the arbitration provision contained in his May 15, 2017 loan.  A copy of that written notice is attached to TitleMax's motion as Exhibit A.  Mr. Romero subsequently filed a class action complaint in New Mexico state court and Defendants removed it to this Court.

## ARGUMENT AND AUTHORITY

TitleMax's motion is based on the false premise that there remains an arbitration provision to enforce.  TitleMax is wrong.  Moreover, the class action ban TitleMax seeks to enforce is unconscionable as a matter of New Mexico law.

**I.    IT IS IMPOSSIBLE TO COMPEL THE ARBITRATION OF A DISPUTE ARISING FROM A CONTRACT THAT NO LONGER HAS AN ARBITRATION AGREEMENT.**

Having complete control over the scope of its arbitration agreement, Defendants chose to draft one both banning the aggregation of claims and permitting borrowers to opt out of it.  Defendants did not exclude the class action ban from the opt out provision or otherwise limit its scope.  Thus, when Mr. Romero opted out of the provision, he opted out of it entirely.  There is now nothing of that provision left to enforce, including the class ban.

**A.    The Opt Out Provision Plainly And Unambiguously Permits A Borrower To Opt Out Of The Arbitration Provision In Its Entirety.**

TitleMax's motion fails for the very basic reason that the unambiguous language of the opt out provision applies to the entirety of the arbitration agreement containing that language.  Defendants have chosen to craft their arbitration agreement in a question-and-answer format.  The entirety of the opt out provision is put to the borrowers as follows:

> Question: Can you opt-out of this clause?  Short Answer: Yes, within 60 days. Further Detail: If you do not want this Clause to apply to you, you must tell us in writing within 60 calendar days after signing this Agreement.  Send your signed, written notice to the Notice Address.  Give your name, address, loan number and loan date.  State that you "opt out" of the arbitration clause.  We do not allow electronic delivery.

(TitleMax Motion, Ex. A, pg. 3, Ex. B, pp. 3, 8.)

And that is it.  Borrowers are told that they can opt out of the arbitration clause – which includes the waivers of rights TitleMax is nonetheless still trying to enforce – by

sending a letter to Defendants at a specified address.  There is nothing to indicate that the opt out is effective for some terms of the arbitration agreement and not for others.  More specifically, the opt out is not limited to the borrower's own claim.  No language provides that a borrower who opts out of the arbitration provision is opting out of everything in the arbitration provision except the right to "[b]ring or be a class member in a class action or class arbitration."  (TitleMax Motion, Ex. A, pg. 4; Ex. B pp. 4, 9).  Simply put, when a borrower opts out of the arbitration provision, he or she opts out of all of it, retaining each and every right he or she would otherwise waive.

This conclusion is compelled not only by the language Defendants chose and the force of logic, but also by federal law.  For all of the generic cases TitleMax cites in its motion about the preference for arbitration, none of them hold that a borrower is bound by an arbitration provision after opting out of it, and undersigned counsel was unable to locate one in this or any other Circuit.  This is unsurprising because the absurdity of applying an arbitration provision after a consumer has specifically opted out of it is apparent on its face.

Indeed, despite the liberal application of the Federal Arbitration Act ("FAA"), that Act does not require a party to "submit to arbitration *any* dispute which he has not agreed so to submit."  *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir. 2003) (emphasis added) (quoting *AT&T Techs. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986), internal quotation marks omitted).  Instead, the FAA requires courts to enforce "agreements to arbitrate, like other contracts, in accordance with their terms."  *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 478 (1989) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)).  Enforcing an arbitration agreement according

to its terms "is fully consistent with the goals of the FAA, even if the result is that the arbitration is stayed where the Act would otherwise permit it to go forward" because rigorous enforcement according to the agreement's terms gives "effect to the contractual rights and expectations of the parties[] without doing violence to the policies behind the FAA." *Volt Info. Sciences*, 489 U.S. at 478.   Here, rigorous enforcement of the arbitration agreement Defendants have drafted and inserted into all of their loan contracts requires enforcement of the opt out provision Mr. Romero exercised.[1]

While there is no law holding a party to an arbitration agreement the party expressly declined to be bound by, there is law in this Circuit uniformly enforcing arbitration provisions when a plaintiff *fails* to exercise an available opt out right.  *See, e.g., Cornoyer v. AT&T Mobility Servs.*, 2016 U.S. Dist. LEXIS 140109, *7-9 (Dist. N.M. Oct. 5, 2016) (enforcing arbitration agreement 213 days after litigation was filed because, in part, the plaintiff had failed to avail himself of the opportunity to opt out of the agreement); *Howard v. Ferrellgas*, 92 F. Supp. 3D 1115, 1138-39 (Dist. Kan. 2015) (enforcing arbitration agreement where the plaintiff had a meaningful opportunity to opt out of the agreement and did not).   This is perhaps why Defendants provide their borrowers with the opportunity to opt out of the arbitration provision included in all of their loan contracts.[2]

The position TitleMax takes is directly contrary to the language of the arbitration provision it seeks to enforce.  That provision entitled Mr. Romero to opt out of its terms,

---

1  In any event, courts have had precious little opportunity to examine the opt out provision in Defendants' arbitration agreement since, of the approximately 32,481 loans Defendants have made to at least 12,120 different customers in New Mexico since March 11, 2013, **only three of them have exercised their right to opt out of the arbitration provision**.  *See* Notice of Removal [Doc. 1], pg. 3 and pg. 4, n. 2.

2  But here, as discussed in Section I(C) below, TitleMax now contends that the opt out right it provides is almost entirely illusory.

including the term prohibiting him from acting as a class representative.  Mr. Romero did

not agree to that limitation and TitleMax thus cannot enforce it against him.  In light of Mr.

Romero's opt out, the entirety of the arbitration provision TitleMax seeks to enforce no

longer exists.

This fact fatally undercuts literally every argument TitleMax makes in its motion

about the arbitrability of Mr. Romero's claims.  TitleMax is right that claims alleging

unconscionable lending practices would normally fall within the scope of Defendants'

arbitration provision, but that is flatly irrelevant.  Even the pro-arbitration federal law

TitleMax would usually be able to rely on is unavailing here because the party against

whom TitleMax seeks to enforce Defendants' arbitration provision ***did not agree to be***

***bound by it***.  Plaintiffs do not contend that the claims raised in the complaint are

substantively outside the scope of the arbitration agreement.  Plaintiffs instead contend

that the arbitration agreement simply has no applicability.  Since Mr. Romero opted out of it,

the Court cannot enforce the arbitration agreement or any part of it against him.

**B.     Mr. Romero's Opt Out Entitles Him To Represent A Class Of Borrowers With Similar Claims.**

As discussed above, Defendants provide to their borrowers the opportunity to opt

out of every single term of the arbitration provision contained in their loan contracts.  One

of those terms is the agreement to not act as a class representative.  Mr. Romero, in opting

out of the arbitration provision contained in his May 2017 loan from Defendants, expressly

did *not* agree to refrain from so acting.

TitleMax uses the fact that Mr. Romero seeks to represent a class as an opportunity

to make a brief argument that Mr. Romero cannot meet the typicality requirement for class

certification.  *See* TitleMax Motion, pg. 18.  As discussed more fully in Section II below, that argument is premature.  All that is properly before the Court now is whether Mr. Romero is still somehow bound by an arbitration agreement he opted out of.

TitleMax contends that permitting Mr. Romero to represent a class consisting of TitleMax's borrowers would "subvert" otherwise enforceable contracts.  (TitleMax Motion, pg. 18.)  TitleMax makes this argument without a hint of irony despite the fact that what they ask the Court to do is expressly subvert an enforceable contract – the opt out clause of the arbitration agreement.   But whether any other class members also opted out is irrelevant.  The action or inaction of third parties cannot extinguish or otherwise interfere with Mr. Romero's contractual rights.   Indeed, such is the very premise of a claim for tortious interference with contract.  *See Gregory Rockhouse Ranch, LLC v. Glenn's Water Well Serv.*, 2008-NMCA-101, ¶ 38, 144 N.M. 690, 191 P.3d 548.

None of Defendants' other borrowers are before this Court seeking to pursue a judicial remedy for Defendants' unconscionable loan practices.  But Mr. Romero specifically and purposefully opted out of the contractual language that would otherwise have prohibited him from doing so.  And, importantly, it would otherwise have permitted him to do so as a class representative.  At the point Mr. Romero rejected that limitation he is free to pursue whatever judicial remedy – including a class remedy – that he chooses.   The language of the opt out provision simply does not lend itself to TitleMax's construction.

The question, ultimately, is how the Court should resolve the apparent conflict between, on the one hand, the full vindication of Mr. Romero's rights in validly opting out of Defendants' arbitration provision and, on the other hand, what Defendants would

characterize as the benefit of their bargain prohibiting the borrowers who did not opt out of arbitration from aggregating their claims. This question can only be resolved by principles of contract interpretation and application as defined by New Mexico law. As discussed in Section I(C)(1) below, the principle most powerfully at work here is that ambiguities in a contract (and particularly an adhesive one) are strictly construed against the drafter of that contract. To the extent the language Defendants chose in crafting their arbitration agreement makes possible judicial consideration of claims belonging to borrowers who did not opt out of that agreement, that fault lies entirely and only with Defendants. No principle of contract or equity would permit Defendants to deprive Mr. Romero of the benefit of the bargain they offered to him because it turns out that the bargain contains something Defendants do not like. They are stuck with the language they drafted and the rights that language conferred on Mr. Romero.

**C.    The Arbitration Agreements Contained In Mr. Romero's First Two Loan Contracts With Defendants Do Not Require Him To Arbitrate Issues Related To His Third Loan Contract.**

TitleMax's primary argument is that Mr. Romero's decision to opt out of the arbitration agreement in his May 2017 loan agreement is meaningless because that loan was actually just a "refinancing" of a prior loan. TitleMax's anemic interpretation of Defendants' arbitration agreement is at odds both with its language and with fundamental principles of contract law. Mr. Romero is entitled to all of the rights provided to him by opting out of the arbitration agreement in the May 2017 loan contract, including his rights to seek judicial resolution of his complaints and to do so as a class representative.

**1.   Defendants drafted the adhesive arbitration agreement at issue and its terms are to be strictly construed against them.**

"In a federal diversity case, '[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.'" *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216-17 (10th Cir. 2011) (quoting *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).[3]   A court exercising jurisdiction under the Class Action Fairness Act ("CAFA") still sits in diversity, because CAFA merely "operates as an expansion of diversity jurisdiction" and is found in 28 U.S.C. § 1332 with traditional diversity jurisdiction requirements.   *See Valdez v. Metro. Prop. & Cas. Ins. Co.*, 876 F. Supp. 2d 1143, 1163, n. 6 (Dist. N.M. 2012) (citing *Farina v. Nokia, Inc.*, 625 F.3d 97, 110 (3d Cir. 2010)).

A critical principle of New Mexico law governing the interpretation and application of Defendants' arbitration agreements is that any ambiguity in the terms of a contract are to be strictly construed against the party that drafted them.   *See J.R. Hale Constr. Co. v. Union Pac. R.R.*, 2008-NMCA-037, ¶ 49, 143 N.M. 574, 179 P.3d 579 (quoting *Schultz v. Lindsay Constr. Co. v. State*, 1972-NMSC-013, ¶ 6, 83 N.M. 534, 494 P.2d 612); *Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶ 14, 135 N.M. 558, 80 P.3d 495 ("We construe ambiguities in a contract against the drafter to protect the rights of the party that did not draft it.").   This is particularly true where the contract at issue is one of adhesion, like the arbitration

---

3   While TitleMax would likely contend on this point that issues of arbitrability are governed by an act of Congress – the FAA – even that statute recognizes that arbitration agreements, as contracts, are subject to contract law.  *See* 9 U.S.C. § 2 (permitting the invalidation of an arbitration clause on "such grounds as exist at law or in equity for the revocation of any contract.").  The FAA does not guide or direct a Court's contractual interpretation.  That is left to the law of the relevant state.  This Court must therefore turn to New Mexico law in determining what the language of the arbitration agreement means and how it should be applied.  *See Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997) (recognizing that state law principles of contract are preempted by the FAA *only* when they take their meaning "precisely from the fact that a contract to arbitrate is at issue.") (quoting *Perry v. Thomas*, 482 U.S. 483, 492, n. 9 (1987) (emphasis added)); *G.W. Van Keppel Co. v. Dobbs Imps., LLC*, 2014 U.S. Dist. LEXIS 146913, *3 (Dist. Kan. Oct. 15, 2004) (noting that "the interpretation of contracts – including arbitration agreements – is generally a matter of state law. . .").

agreement TitleMax seeks to enforce. *See Salazar v. Citadel Communications Corp.*, 2004-NMSC-013, ¶ 15, 135 N.M. 447, 90 P.3d 466 (noting "the rule, oft-repeated in this state, that we construe ambiguous adhesion contracts against the drafter."). The goal of applying state law in diversity cases is to "obtain[] the result that would be reached in state court." *Butt v. Bank of Am., N.A.*, 447 F.3d 1171, 1179 (10th Cir. 2007).

Defendants, of course, drafted the adhesive arbitration agreement TitleMax now seeks to enforce. As the drafters, and particularly as drafters with far, far greater sophistication in the title lending business than Mr. Romero (or any member of the class), any ambiguity in that agreement is to be resolved against Defendants.

> **2.    Mr. Romero's opt out is not governed by any prior loan agreement with Defendants.**

Incredibly, TitleMax argues not only that Mr. Romero is precluded from acting as a class representative, but that his opt out is ineffective as to the very loan agreement containing the opt out provision he exercised. In other words, TitleMax contends that the opt out right contained in the May 2017 loan agreement Mr. Romero signed with Defendants is meaningless and actually confers upon Mr. Romero no rights at all: "Because Mr. Romero's third Loan Agreement arose from a refinancing, he had already agreed to arbitrate any disputes as to his third Loan Agreement." (TitleMax Motion [Doc. 9], pg. 14.) This argument fails for at least four reasons.

First, TitleMax would have the Court believe that it was possible for Mr. Romero to agree to waive rights in connection with a contract that did not even exist at the time of the alleged waiver. This simply defies reason.

Second, while TitleMax refers to Mr. Romero's third loan as a refinancing, the documents Defendants used to memorialize the parties' arrangement tell a different story. The document, attached as Exhibit A to TitleMax's motion, is entitled "Loan Agreement," not "Loan Refinancing" or "Refinancing Agreement" or anything similar. The only differences between the May 2017 loan and the two prior loans are in the amounts loaned and in the interest rates.[4] The loan carries an account number different from the two prior loans. The proceeds from the May 2017 were used to pay off the second loan. Defendants did not enter into some kind of agreement with Mr. Romero to modify the terms of the first or second loan. They gave Mr. Romero a second loan that simply replaced the first and then a third that replaced the second. Each time, the prior loan necessarily ceased to exist. The May 2017 loan is thus a separate loan, independent from the previous two. That the loan proceeds were used to pay off (and thereby extinguish) a prior loan (that had its own different loan number) does nothing to change this fact, and TitleMax is equally unable to change it through the simple artifice of labeling the contract a "refinancing" in its motion.

Indeed, in its motion to strike Plaintiffs' jury demand filed in this very case, TitleMax states that Mr. Romero and Defendants "entered into three (3) ***separate*** Loan Agreements," describes Mr. Romero as having "executed no less than three ***separate*** Loan Agreements over a period of less than a year" with Defendants, and describes those loans as his "first loan" and his "subsequent loans." (TitleMax's Motion to Strike Plaintiffs' Jury Demand [Doc.

---

4 One may wonder, then, about the point of TitleMax writing a third loan to Mr. Romero where all of the loan proceeds were used to pay off the second loan. The point is that Mr. Romero had been paying on the second loan for ten months, and by writing the third loan, TitleMax was able to extend Mr. Romero's repayment period by another twenty-four months, thereby increasing by another $4,056.09 the total amount they would extract from him.

11]. pp. 1, 8, emphasis added.)  TitleMax may not take a contrary position before this Court because, on this motion, it suits its purposes to do so.

Third, Defendants have chosen to use *precisely* the same arbitration agreement in all of their loan contracts, including the loan contract that TitleMax now describes as a "refinancing."  As a result, the May 2017 loan agreement contains an arbitration agreement permitting Mr. Romero to opt out of its application.  As discussed above, that opt out contains no limiting language whatsoever; it is on its face an opt out of ***every single*** term in the arbitration provision.  Far from what TitleMax derides as "forum shopping" and a lack of candor to the Court (TitleMax Motion, pg. 3), this is little more than the straightforward enforcement of the very terms that Defendants chose to use in each of its loan contracts.  If there is any deficit of good faith, it is on the part of TitleMax.

Fourth, even if there is some ambiguity in the opt out language Defendants use in their arbitration agreements, the law on which TitleMax exclusively relies – cases making general pronouncements about the strength of the judicial preference for the enforcement of arbitration agreements (*see* TitleMax Motion, pp. 12-14) – is unhelpful to TitleMax's effort to construe the ambiguity in a way that binds Mr. Romero to an arbitration provision he expressly rejected.  Why?  Because there is here an even more fundamental and powerful background principle at work, one that encompasses *all* contracts, including agreements to arbitrate: any ambiguities in the arbitration agreement Defendants have drafted are to be strictly construed against Defendants.

The only potential ambiguity before the court is apparent from TitleMax's argument. TitleMax is correct that, on its face, the arbitration agreement in the first two loan contracts

Mr. Romero signed with Defendants encompasses any dispute about "extensions, renewals, refinancings, or payment plans." (TitleMax Motion, pg. 6.)  But TitleMax's reliance on the alleged clarity of that language is misplaced.  First, as discussed above, it does not provide any further definition of "refinancings."  Does that term encompass a new loan that a borrower uses to pay off an older one?  While, as explained above, Plaintiffs believe it does not, there is, at a minimum, ambiguity on this point.  But more fundamentally, at the same time that the arbitration agreement encompasses "refinancings," it also contains a provision that allowing the borrower to opt out of the arbitration agreement in its entirety.

The provision cannot be construed to both prohibit a borrower's opting out of the arbitration agreement in a subsequent loan (even though that agreement contains an opt out provision) and also to permit a borrower to do so.  Because Defendants drafted the language and enjoyed immensely greater bargaining power when they offered the contract to Mr. Romero, these ambiguities are to be resolved in Mr. Romero's favor.  As a result, the Court must find the opt out to be effective.  On this point, TitleMax's argument that the May 2017 loan is merely a refinancing of a prior loan works in Mr. Romero's favor.  If that is the case – if each of these three loan contracts are all really about the same loan – then Mr. Romero has opted out of arbitrating all three loan contracts because, when he refinanced the loan for the second time, he opted out of arbitrating any and all disputes concerning that loan, including "refinancings."  Either way, the end result is the same: Mr. Romero has opted out of arbitrating his dispute with Defendants.  TitleMax's argument to the contrary is directly violative of well-established principles of contract law and the Court should accordingly reject it.

In this way, TitleMax is simply wrong to contend that "nothing in the first two Loan Agreements . . . gives Plaintiff a 'get out of jail free' card that will allow him, by opting out in a third Loan Agreement, to disassociate himself from the first two Loan Agreements he has made." (TitleMax Motion, pg. 19.)  While the characterization of its own opt out provision as a "get out of jail free card" raises some interesting Freudian questions, the fact is that the opt out provision in the May 2017 loan contract is effective.  It either arises from a stand-alone contract untethered from the previous loan contracts or the opt out language in the May 2017 loan contract creates and ambiguity that must, by law, be resolved in Mr. Romero's favor, *i.e.*, recognizing the validity of his decision to opt out of arbitration (or, as discussed in Section III(C) below, is illusory and renders the arbitration provision unconscionable and unenforceable).

Ultimately, TitleMax asks the Court to so narrowly construe the opt out provision in the arbitration agreement Defendants have drafted as to effectively strip that provision from the arbitration agreement.   The Court should view this effort with suspicion.  *See Lamour v. Uber Techs., Inc.*, 2017 U.S. Dist. LEXIS 29706, *4 (S.D. Fla. Mar. 3, 2017) ("If I concluded that the opt-out clauses here were a ruse or were purposefully ineffective and did not provide the drivers with a real and meaningful opportunity to avoid the arbitration provision, then I would be looking at the agreements under a microscope with a different legal adjustment and magnification.") According to TitleMax, the *only* way a borrower can actually opt out of the arbitration provision is to submit the opt out in writing and continue to do so every time the borrower takes out any additional loans from Defendants.  If the borrower opts out initially but fails to do so when taking out another loan, the proceeds of

which are used to pay the first loan, TitleMax would undoubtedly take the position that the failure to opt out of the arbitration provision in the second contract doomed any attempt to seek judicial relief.  Alternatively, if, as here, a borrower opts out of a loan, the proceeds of which pay off a prior loan, TitleMax would have the Court hold that the opt out is meaningless because the borrower had previously agreed to arbitrate any dispute arising from a "refinancing."

The problem with this approach is manifest.  The opt out provision is not, in fact, meaningless.  It confers a real and enforceable right on Defendants' borrowers.  Mr. Romero availed himself of that right and the Court should reject TitleMax's efforts to retroactively take it from him despite having fully complied with the procedure through which Defendants told him he could exercise it.

As TitleMax points out in its motion, "New Mexico courts have strictly construed contracts and have enforced the contractual language the parties have agreed to." (TitleMax Motion, pg. 19.)  Unfortunately for TitleMax, it makes this declaration in the context of urging this Court to hold Mr. Romero to language that would extend an arbitration agreement to a separate contract when, in that separate contract, Mr. Romero specifically and validly rejected arbitration.  The law TitleMax cites is more appropriately applicable to the opt out language Defendants themselves drafted and inserted in the May 2017 loan contract.  Defendants should be held to the terms of the contract they are so eager to enforce.  The Court should deny TitleMax's motion.

## II.   QUESTIONS CONCERNING CLASS CERTIFICATION ARE IRRELEVANT TO DECIDING WHETHER THE ARBITRATION PROVISION MR. ROMERO OPTED OUT OF IS SOMEHOW NONETHELESS ENFORCEABLE.

TitleMax, perhaps understandably, devotes substantial space in its motion urging the Court to declare that Mr. Romero is, by virtue of the arbitration agreement, unable to pursue claims as the representative of the class of individuals having taken out loans from Defendants in the past four years.  In that effort, TitleMax declares that Mr. Romero "should be held strictly accountable for the Loan Agreements he has made and should not be permitted to circumvent his understandings and contractual commitments through this artifice." (TitleMax Motion, pg. 19.)  It is, at best, ironic that TitleMax appeals to the Court for strict accountability.  What TitleMax describes as "this artifice" is nothing more than Mr. Romero proceeding with litigation in accordance with the plain language of the opt out provision Defendants offered to him.

As it relates to Mr. Romero's ability to pursue his own claims in court, TitleMax's argument fails for the reasons discussed in Section I above.  To the extent it relates to Mr. Romero's ability to represent a class of Defendants' borrowers, the Court need not address the issue at this stage.  TitleMax is not seeking to compel the *arbitration* of class claims; they are seeking a declaration from the Court that Mr. Romero cannot pursue class claims at all.  That issue is a straightforward question of class certification (and more particularly of typicality).  If the Court decides that Mr. Romero is still bound by the arbitration agreement despite having jumped through the hoops Defendants established for him to opt out of it, it will be left to an arbitrator to decide if Mr. Romero is bound by the class action waiver.  If, however, the Court decides that TitleMax is bound by the language of the opt out provision

it drafted, that would include Mr. Romero's ability to be a class representative but would not resolve of any certification issues because they are not yet properly before the Court.

TitleMax nonetheless suggests that Mr. Romero is not a typical member of the purported class because only he and two other people have ever exercised their opt out rights (and, according to TitleMax, only the other two did so with any effect). *See* TitleMax Motion, pg. 18.  In making that argument, TitleMax assumes that the appropriate metric for determining typicality in a case like this is whether the borrower has opted out of the arbitration provision in the loan contracts.  TitleMax errs in doing so.

"A prerequisite for certification is that the class representative be a part of the class and *possess the same interest and suffer the same injury* as class members." *Rector v. City and County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003) (emphasis added) (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 2016 (1974)).  "[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the *same legal or remedial theory*." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) (emphasis added).  TitleMax itself recognizes that Mr. Romero has the same interest and suffered the same injury as the members of the putative class:

> [Mr. Romero] specifically admits his claims arise out of TitleMax' business practices and the terms of its "Agreements" with its customers.  The only relationship between the parties is that of a lender and debtor.  Plaintiff's claims in this matter concern what he alleges are unfair or illegal loan terms and which, of course, can only logically arise out of and relate to the borrowers' Agreements with TitleMax (*e.g.,* the Loan Agreement).  The claims sought to be arbitrated arise out of that relationship and the arbitration clause specifically covers the borrowers['] "relationship" with TitleMax.

TitleMax Motion, pg. 17.  Mr. Romero was victimized by Defendants' unconscionable loan

practices.  So, too, were virtually all (if not in fact all) of Defendants' other New Mexico customers.  The injuries are thus exactly the same.  Moreover, Mr. Romero's claims and the claims of the class members are likewise based on the same legal theory, namely violations of the New Mexico Unfair Practices Act and New Mexico's common law doctrines of procedural and substantive unconscionability.

It is for this reason that TitleMax misses the mark in arguing that "[b]ecause arbitration is a matter of contract, allowing Plaintiff to use the procedural device of a class action to declare his rights under the contracts in which he agreed to arbitrate . . . would subvert his and the other borrowers' otherwise enforceable contracts." (TitleMax Motion, pg. 18.)  Mr. Romero does not seek to "declare his rights under the contracts in which he agreed to arbitrate."  It bears repeating yet again that Mr. Romero, in truth, specifically ***did not agree*** to arbitrate his claims.  TitleMax's argument necessarily depends on the existence of an agreement to arbitrate.  At the moment Mr. Romero exercised the opt out right Defendants offered to him in the May 2017 contract, the arbitration agreement in that contract was no longer of any significance.

So while the Court need not now decide whether Mr. Romero satisfies the typicality requirement of Rule 23 (or any of Rule 23's other requirements), TitleMax has employed the wrong means of analyzing that question.  Mr. Romero's claims are legally identical to the claims of the class, and the only factual differences are the amounts loaned to and paid back by Mr. Romero and the members of the class.  The failure of other borrowers to exercise their opt out right does not isolate Mr. Romero in any way relevant under Rule 23.

III.   **THE ARBITRATION PROVISION DEFENDANTS' EMPLOY IS UNCONSCIONABLE AS A MATTER OF NEW MEXICO LAW AND THUS UNENFORCEABLE.**

Because this case arose in state court – and not federal court – the Federal Arbitration Act, 19 U.S.C. §§ 1 through 16, should not apply, and the Court should instead apply the straightforward New Mexico law invalidating arbitration provisions like the one Defendants seek to enforce that ban the aggregation of claims.  But even applying federal law on the subject, the arbitration agreement is procedurally unconscionable and thus unenforceable because the opt out provision TitleMax tries so hard to avoid is, according to TitleMax itself, essentially meaningless.

A.   **The FAA Should Not Apply To Cases Arising In State Court And Under State Law.**

In *Southland Corp. v. Keating*, 465 U.S. 1, 12 (1984), the Supreme Court concluded that the FAA should apply "in state as well as federal courts."  The Court did so despite the plain language of Section 3 of the FAA:

> If any suit or proceeding be brought in *any of the courts of the United States* upon any issue referable to arbitration under an agreement in writing for such arbitration, the court n which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . .

9 U.S.C. § 3 (emphasis added).  The following section, which addresses a situation in which one party simply refuses to submit to arbitration, likewise expressly references "any United States district court which, save for [the arbitration] agreement, would have jurisdiction" for an order to compel arbitration.  9 U.S.C. § 4.

*Southland* also did not address the issue directly, making the suggestion quoted above in dicta.  While the Court has slowly acquiesced to treating that dicta as holding, *see, e.g., Arizona v. Rumsey*, 467 U.S. 203, 212 (1984), it was wrong to do so.  Because the FAA should not apply to cases arising in state court, the Supreme Court's opinions expansively applying the FAA to invalidate state unconscionability law as it applies to agreements to arbitrate should not operate here as a bar to the New Mexico law, discussed below, that would squarely reject Defendants' arbitration provision as unconscionable.

The opinion most directly applicable here is *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), where the Court overruled the so-called *Discover Bank* rule, a California state court rule that declared unconscionable an arbitration provision banning class action relief.  *Id*. at 352.  The New Mexico law urged below is, in most significant respects, the same as the *Discover Bank* rule rejected in *Concepcion*.  But the opinion is inapposite here, where the FAA does not apply in the first instance.

Plaintiffs recognize that this Court is obligated to adhere to Supreme Court precedent, even wrongly-decided cases like *Southland* that have come to be treated as controlling law on an issue discussed only in dicta.  Plaintiffs raise the argument here primarily for preservation purposes.  *Concepcion* was a sharply divided 5-4 opinion.  There are four votes currently on the Supreme Court to overturn it directly, and Justice Thomas has repeatedly and consistently maintained his view that the FAA does not apply to cases arising in state court.  *See, e.g., DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471 (2015) (Thomas, dissenting) ("I remain of the view that the Federal Arbitration Act . . . does not apply to proceedings in state court") and cases cited therein.

**B.     Defendants' Arbitration Agreement Is Unconscionable Under New Mexico Law.**

New Mexico law invalidates Defendants' arbitration agreement on two grounds. First, it is a procedurally unconscionable contract of adhesion.  Second, it is substantively unconscionable because it purports to ban the aggregation of claims.

**1.     The arbitration agreement at issue is a procedurally unconscionable contract of adhesion.**

Procedural unconscionability "examines the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other."  *Cordova v. World Finance Corp.*, 2009-NMSC-021, ¶ 23, 146 N.M. 256, 208 P.3d 901 (citing *Guthmann v. La Vida Llena*, 1985-NMSC-106, ¶ 18, 103 N.M. 506, 709 P.2d 675).  "When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion."  *Rivera v. Am. Gen. Fin. Srvs.*, 2011-NMSC-033, ¶ 44, 150 N.M. 398, 259 P.3d 803.  Such contracts "generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position" (*id.*) and are unenforceable "when the terms are patently unfair to the weaker party."  *Cordova*, 2009-NMSC-021, ¶ 33.

There is little question that the contracts by which Defendants do business are contracts of adhesion.  They are standardized contracts, the party offering them – Defendants – enjoy a position of vastly superior bargaining strength, and they are functionally offered on a take-it-or-leave-it basis.  *Rivera*, 2011-NMSC-033, ¶ 44.  It is true that the arbitration agreements at issue contain an opt out clause by which a borrower can

avoid arbitration by submitting a written declination within sixty days of signing the loan agreement to a "Notice Address" buried in the loan contract.  Even assuming Defendants' borrowers are aware of the ability to opt out or understand the significance of that option (a dubious assumption at best), Defendants require those borrowers to take action Defendants by now must know they will not.  As Defendants indicate, of the 12,120 people who have taken out one or more of the 32,481 loans Defendants have written in New Mexico in the last four years, a grand total of ***three*** of them – including Mr. Romero – have opted out of Defendants' arbitration agreement.  *See* Notice of Removal [Doc. 1], pg. 3, n. 2.[5]

It is not necessary that a contract provision be both procedurally and substantively unconscionable before a New Mexico court will refuse to enforce it.  *See Cordova*, 2009-NMSC-021, ¶ 24 ("While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all.").  Defendants' arbitration agreements are procedurally unconscionable not only because they are contracts of adhesion, but because they contains an illusory opt out provision that, according to Defendants, does not do what the language of the provision itself indicates.  The agreement is accordingly invalid.

---

5  As discussed above, TitleMax also ultimately, if unwittingly, argues that the opt out is purely illusory.  *See* TitleMax Motion, pg. 4 (seeking an order from the Court requiring Mr. Romero to arbitrate even his third loan from Defendants despite the fact that, according to the plain terms of that loan contract, Mr. Romero opted out of Defendants' arbitration agreement).

2.      **Defendants' arbitration agreement unconscionably bars the aggregation of claims.**

Defendants' arbitration provisions are independently unconscionable under New Mexico law because they purport to ban the aggregation of claims.  The New Mexico Supreme Court held such class action bans to be unconscionable in *Fiser v. Dell Computer Corp.*, 2008-NMSC-046, ¶ 25, 144 N.M. 464, 188 P.3d 1215.  As discussed above, federal law – and in particular *Concepcion* and *Italian Colors* – have potentially cast doubt on the continued viability of *Fiser*.  The case remains, however, the law of New Mexico.[6]  Because the FAA should not apply in this case, New Mexico law concerning the arbitration provision at issue does.  It is unconscionable and the Court should deny TitleMax's motion.

C.      **Defendants' Arbitration Agreement Is Procedurally Unconscionable And Thus Unenforceable Because The Opt Out Provision It Contains Is Illusory.**

Under New Mexico law, illusory contracts, including arbitration agreements, are unenforceable.  *See generally Salazar v. Citadel Communs. Corp.*,2004-NMSC-013, ¶ 11, 135 N.M. 447, 90 P.3d 466 (concluding that because an arbitration agreement was subject to unilateral modification by one party, it was illusory and unenforceable).  While the illusory nature of the arbitration agreement here is not due to Defendants' ability to unilaterally modify it, the general proposition still applies – an illusory contract right renders the contract unenforceable.

As discussed in Section I(C)(2) above, TitleMax itself has argued that the opt out provision in its arbitration agreements is meaningless.  Because that provision does not

---

6  In an unpublished opinion, the New Mexico Supreme Court noted the existence of "legitimate questions" about *Fiser* arising from *Concepcion* and *Italian Colors*.  The court, however, expressly declined to answer those questions and has taken no steps to overturn *Fiser*.  *See Felts v. CLK Mgmt.*, N.M. S. Ct. Nos. 33,011 and 33,013, ¶ 17 (Aug. 23, 2012).

give borrowers a meaningful opportunity to opt out of arbitration, the provision is unenforceable. *See Gillette v. Uber Techs.*, 2015 U.S. Dist. LEXIS 95709, *13 (N.D. Cal. Jul. 22, 2015) (reiterating a finding that an arbitration provision was unconscionable and unenforceable because its opt out provision was illusory). Taken alone, the fact that only three of the 12,120 customers TitleMax has had in New Mexico have exercised their opt out right supports the conclusion that the opt out right is illusory. *Id.* ("The fact that only about 270 of Uber's phalanx of [160,000 California] drivers successfully opted out of the 2013 Agreement arbitration clause supports, rather than undermines, this Court's conclusion that the opt-out right in the 2013 Agreement was essentially illusory and ineffective.") But Plaintiffs' argument here is not premised only, or even principally, on the fact that a statistically-insignificant .025% of their borrowers have at least attempted to opt out of arbitration. The facts here are worse, where TitleMax urges this Court to interpret and apply the opt out language so narrowly that virtually none of its borrowers could ever avail themselves of their right to reject arbitration and pursue their claims in court.[7]

Ultimately, the law of procedural unconscionability prevents Defendants from enforcing an arbitration agreement that offers borrowers a meaningless right to opt out of that agreement. But according to TitleMax itself, that is precisely what Defendants here have done. The circumstances TitleMax would leave open under which an arbitration opt out would be effective are so particular (and cover so few potential loan transactions) as to render the entire arbitration agreement procedurally unconscionable and unenforceable. Just as federal courts in California have "significant doubts that the California Supreme

---

7  Indeed, accepting TitleMax's argument here and finding Mr. Romero's opt out ineffective would reduce the percentage of borrowers who had managed to opt out of Defendants' arbitration provision to .016%.

Court would vindicate an opt-out clause simply because a few signatories out of thousands were able to (and did) successfully opt-out," *Gillette*, 2015 U.S. Dist. LEXIS 95709 at *13 (quoting *Mohamed v. Uber Techs., Inc.*, 2015 U.S. Dist. LEXIS 75288, *13 (N.D. Cal. June 9, 2015)), this Court should have similar misgivings about how the New Mexico Supreme Court would view TitleMax's effort to restrict the opt out clause in Defendants' arbitration agreements. Either Mr. Romero's opt out is effective or his right is illusory, rendering the entire arbitration provision unenforceable. The Court must deny TitleMax's motion.

## CONCLUSION

While it is understandable that TitleMax would try to prevent Mr. Romero from proceeding as a class representative, the Court should be less forgiving of TitleMax's attempt to preclude him from pursuing judicial relief after availing himself of the arbitration opt out right Defendants' include in every loan contract they write. The only issue properly before the Court on TitleMax's motion is whether Mr. Romero, who opted out of the entirety of Defendants' arbitration agreement, may proceed with this litigation. No class certification questions are yet ripe for determination. There is no longer an arbitration agreement for the Court to enforce because Mr. Romero rejected it in accordance with the procedure Defendants established for him to do so. TitleMax's arguments to the contrary are unavailing and, ultimately, render the entire arbitration agreement unenforceable in any event. Regardless of the path the Court takes – finding the opt out effective or finding the opt out provision to be illusory and the arbitration agreement therefore unenforceable – the end result is the same: the Court should deny TitleMax's motion and allow Mr. Romero to proceed.

Respectfully submitted,

/s/ Scott Fuqua
Scott Fuqua
Fuqua Law & Policy, P.C.
P.O. Box 32015
Santa Fe, NM 87594
(505)982-0961 – Telephone
scott@fuqualawpolicy.com

and

McGEHEE ✯ CHANG, BARNES, LANDGRAF

Jack E. McGehee
jmcgehee@lawtx.com
H. C. Chang
hcchang@lawtx.com
Stephen A. Barnes
sbarnes@lawtx.com
Benjamin T. Landgraf
blandgraf@lawtx.com
10370 Richmond Ave., Suite 1300
Houston, Texas 77042
(713) 864-4000
(713) 868-9393 fax

*Attorneys for Plaintiffs and Plaintiff Class*

**CERTIFICATE OF SERVICE**

I hereby certify that I served a true and correct copy of the foregoing on counsel of record via filing with the CM/ECF system on September 8, 2017.

/s/ Scott Fuqua
Scott Fuqua